Our first case for argument, please. 20-2244 from the District of Minnesota, Libertarian Party of Minnesota et al versus Steve Simon. We'll hear from Mr. Cardall, please. Good morning, Your Honors Counsel. May it please the court, I represent the appellants in this case. Section 204B.07, Subdivision 4 of Minnesota Statutes, as interpreted by the lower court and government, is an unconstitutional burden on Minnesota's minor political parties, candidates, and voters. To quote the statute, I solemnly swear or affirm that I know the contents and purpose of this petition, that I do not intend to vote at the primary election of the office for which this nominating petition is made, and I sign this petition of my own free will. It was a Rule 12 dismissal, so it's de novo review, and I know the court knows, but I'd like to remind the court of the Anderson v. Calabresi standard of review. From the case 460 U.S. at 789-790, a court, quote, must identify and evaluate the precise interest put forward by the state as justifications for the burden imposed by its rule. In passing judgment, the court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. So, in a sentence, it is not necessary to burden the plaintiff's rights with this statutory oath when there are two constitutional alternatives that do not burden the plaintiff's rights in this way. For argument's sake, based on a reading of the Fourth Circuit Opinion in Socialist Workers Party v. Heckler, 890 F. 2nd, 1303, 1989, there are two constitutional ways to tie a voter signing a minor party candidate nominating petition into the major political party primary process. First, as in West Virginia, the signer forfeits the right to vote in the major political party primary. Therefore, the primary precinct roster would indicate the signer has forfeited the right to vote. Secondly, the signer maintains the right to vote in the major political party primary, as done in Kentucky, dissent at page 1313. In this scenario, the primary precinct roster would indicate the signer has the right to vote. But Minnesota has chosen a third way. Minnesota does not have a statute which states whether a signer has forfeited the right to vote or not. Instead, it has a statutory oath. The lower court's interpretation of the oath is as follows. The oath simply requires nominating petition signers to attest that they do not intend to vote in the primary election for the office underlying the petition. In other words, the oath only requires signers to attest to a present intention not to vote in an upcoming primary. Because the oath is expressly limited to the intent at the time of signature, it does not preclude signers from changing their minds thereafter and vote from voting in a later primary. The petition, therefore, does not require signers to relinquish any right, nor does it subject them to criminal prosecution if they vote in a subsequent primary. But for my clients, Libertarian Party of Minnesota and the members, the statutory oath in section 204 of B.07 subdivision four itself threatens prosecution without assuring the electors, the voters, the potential signers that is, that they are, they have the right to vote in the primary election if they change their mind. So if we look at the interpretation by the court, the technical reading by the court, it doesn't comport with what the Libertarian Party member or candidate presents to the potential signer. The language assuring the elector if they sign that they can later change their mind and vote isn't present. So what the Libertarian Party of Minnesota is claiming in their amended complaint is that it's unnecessary, superb burden on them to have to explain to voters that they can later change their mind and vote in the major political party primary without threat of prosecution when the statutory oath itself doesn't state that. For example, the change mind language is in the found in the amended complaint at paragraphs 133 and 212. This idea of changing minds was a critical presentation in the complaint, the response to the motion dismiss and oral argument, and that's why it's in the opinion of the lower court. My clients are a practical administrator of this oath to potential signers. There's a problem when the government's technical reading of the statute granted accepted by the lower court would not be understood that way by all the public. All the public needs to understand at that moment what that oath means. And here you have a technical class put on by the government adopted by the court granted, but all the public wouldn't understand that. And that's exactly what we complained about in the complaint. Mr Cardo, why isn't this claim on the oath foreclosed by the American Party of Texas case? In the American Party of Texas case, as indicated in the Fourth Circuit opinion, that was an instance where the signer forfeited the right to vote. In this case, we have something different than that. In those states like West Virginia and Florida, I thought in that case, the Supreme Court's decision in that case, I thought upheld a somewhat more onerous oath requirement. My understanding of the case law, including the Fourth Circuit case and the interpretation of the Texas case, and reading the dissent, is the state has the option of the signer forfeiting the right to vote and also would have the option of the signer not forfeiting the right to vote. I'm talking about the Supreme Court decision in 1974, which had an oath requirement that had a notarization requirement on top of it, and the Supreme Court upheld that. How can you get around that case? I get around it because it's distinguishable on the notion that in this particular oath, the interpretation of the government is that the, according to the court, adopted by the court is, that the person can change their mind and later vote. My client is a practical administrator of the oath, and the statutory oath doesn't say that, and as a result, my clients have to explain to, no, no, you can sign this. You won't get prosecuted. You can change your mind later and vote in the upcoming primary. That's different than the Texas case. It may have been onerous in other ways, but this is a real problem, and the government has adopted a different path than the voter forfeiting the right to vote or not forfeiting the right to vote, but rather that you, this idea that if you have an intention to vote in the primary election, you're threatened with a felony. Now, the language is comforting from the court saying, well, you can, basically, you can explain to the potential signer that they can change their mind, but that's not practical. I mean, the public is going to read the statute. Some will read it the way the court did. Some will read it the way the government did. Others will read it, well, I don't know who all the candidates are in the primary. If I sign this, then I can't vote in the primary. Now, the court has said, oh, you can vote in the primary. You shouldn't fear prosecution, but that's a lot of explaining for the LPM to do, Libertarian party members to do, and why is that burden there when the government can just say, look, you forfeit your right to vote if you sign this, or you don't forfeit your right to vote. Counselor, I want to understand your argument a bit here, which is Judge Grunder asked a really good question about, so suppose that the statute was quite clear and said, you have forfeited your right to vote. Well, that sounds like it would be the Texas case. Then you have this situation, and I think the argument you're making, but I'm not sure, and please correct me, but this is vague. In other words, what's different about this, at least your view, is that the voter does not know what to do. The voter may look at it and say, well, maybe I can vote, maybe I can't vote, maybe I should just not vote because I don't know what to do, or maybe I should vote and then I risk prosecution. Is that sort of your argument, sort of a void, verbatim type of argument, or am I misreading you? Well, no, I'm taking the court and say, if that's the technical reading, then that doesn't give the, it doesn't, in the statute, doesn't communicate that to the voter sufficiently that voters would be turned away from it because they have alternative interpretation. So the extent that you're using the word vague in the sense of it's subject to multiple interpretations, yeah, that's the problem. I think the interpretation of the government and the court is clearly unconstitutional because the public would give an ordinary reading to this and that they would say, look, we read this, some of them would, and they'd say, if I sign this, I can't vote in the primary. The court is saying, no, no, if you sign this, you can vote in the primary, there'll be no effect, but we raised this changing minds issue. It was before the court and the court answered the question. This is part of the gladiators being in the arena, right? I want to just follow up. Suppose though that the statute plain old said, absolute prohibition said, you cannot vote after signing a nominating petition, period, the end, there's no technical reading. Would that be okay under the United States Supreme Court decision that Judge Grunder referenced? Yeah, for argument's sake, yes. I'll save the rest of my time for rebuttal. I have a question, counsel, please. Why is this claim with respect to the oath not waived or abandoned below? Well, the setting of this case, it's very difficult. A lot of cases involving statutory interpretation of that way, it wasn't waived below. What we did was we asserted there's a problem here when people change their minds, and it wasn't until the interpretation, basically, that if you sign and change your mind, you don't forfeit your right to vote that our claim became clear. In fact, I think... Sorry, go ahead. So the oath claim, as in the amended complaint, is interconnected with all the claims, and the whole statute comes down. It's not the oath separately. It's non-severable. It has... The claim has not been waived. Oh, you're saying that when you said the oath claims are abandoned as separate claims, that somehow they've survived as being intertwined in something else? Is that what you're saying? Yes. If you took the oath separate and apart from all these factors, for example, if it was contemporaneous with the primary, I don't think there'd be much problem. But the timing sequence here with 14-day period, 65 days or so before the election, creates a real problem. In fact, the people signing the petitions... Okay, I don't want to take any more of your time. I'm sorry. I don't want to take any more of your time. I think I understand what you're saying, but this seems to me to be at least something of a difficulty. Thank you. All right, Mr. Cardle, I assume you're going to reserve the rest of your time. The court will hear from Mr. Harsh. Thank you very much, Your Honor. May it please the court. Good morning. I'm Nathan Hartshorn, Minnesota Assistant Attorney General, and I'm here representing the appellee in this matter, Secretary of State Steve Simon. The first thing I want to address is the algorithm that this court applies for examining a restriction like this. Mr. Cardle, citing Anderson versus Chalabrese, has represented that it's a simple scrutiny balancing of the burden versus the state's interests. That can be part of this algorithm, but he skipped the first step. Before the court can get to that point, it has to determine that this policy, the policies that are being challenged here, impose a substantial burden on the appellants in this case to begin with. The district court held that it does not, and the Secretary's position is that it does not. Specifically, with regard to that algorithm, this court has held in two different decisions, both involving the Libertarian Party. One of them is the Jaeger case from North Dakota. The other one is the Bond case that appellants themselves cited from Missouri. Those cases go into the details of this algorithm. One of those cases found a substantial burden and then upheld the statute under the exacting scrutiny nonetheless. The other case, the Missouri case, found that there was no substantial burden, and it's interesting to contrast the facts of those two cases and see which one of those cases our case looks more like. We would submit that this is much more like Missouri because the policies in this case, in fact, have not prevented the Libertarian Party or pretty much any other minor party or independent candidate from getting on petitions of this variety have successfully been submitted and gotten candidacies onto the Minnesota November ballot between 2000 and 2018. That's what the record reflects, 2000 and 2018. In 2020, I should mention there were 11 more, and the Libertarian Party had one of those 11. They now have 28 out of those. I think it's now 159 candidacies. These appellants, in three cases, these individual appellants have gotten on the ballot almost 30 times, and they're here to claim that these policies freeze them off the ballot. That doesn't make a lot of sense, specifically on the question of substantial burden. Now then, appellants make three arguments in their brief, and I'd like to respond to them in turn. Counsel, before you get there, I actually kind of have the same question that Judge Arnold asked opposing counsel, which is about the abandonment waiver issue. You have them being abandoned as separate claims. I didn't quite understand exactly what the district court was saying, and I saw it as maybe some combination of them still exist, or it could be abandoning both claims. I wasn't sure exactly what was going on, so what's your view of what the district court held, and what's the right answer here? Well, I think that the district court was unclear of what appellants were doing at the district court level, and I confess I'm confused too. We had cross motions, dispositive motions below, and after we had submitted our motion to dismiss, in appellants' response to the motion to dismiss, they had a line or two in their memo, in their response to our motion to dismiss, saying that they were abandoning their claims insofar as they were separate claims about the oath. And the meaning of that representation certainly wasn't clear to me. It wasn't clear to the district court. At oral argument, Judge Doty asked Mr. Cardall, what are you abandoning? What has been abandoned? There are, I believe, eight counts in the complaint. Which of those counts is being abandoned? And I believe Mr. Cardall's statement at oral argument was, I'm not abandoning anything. So it seemed to me, my subjective impression was that the district court was confused by that. I was confused by that. I would not say that I have a clear understanding of what the appellants did or did not abandon in that particular memorandum they filed in the district court. And with regard to abandonment at the district court, I didn't get it. I didn't understand what they were saying. I think more important though, is that the argument they're presenting with regard to the oath in this court is entirely different than the one that they presented from the initial filing of their complaint until the dispositive ruling of the district court. Before the district court, their presentation with regard to the oath is that it's meaningless self-evident. I think we counted 33 times in their quite long complaint that they asserted just as an indisputable fact that this oath bans people who sign these petitions from voting in the August primary. I think we counted 33 times. They didn't do linguistic analysis to get to that conclusion. They drew that conclusion behind the scenes and just presented as a fact over and over and over again. In every filing we have made throughout this case, we've explained that's incorrect. That's not what these words mean. That's not what this oath means. And that was the state of this issue when we were in the district court. Now here we are on appeal and rather than continue arguing, no, this oath prevents our voters from being able to, our supporters, our petition signers, from being able to vote in the August primary. They now are saying for the first time, oh well then, it's vague and misleading and confusing notions they never presented. And in fact, it seems to me they're kind of diametrically opposed to the perspective they had on that oath text when they were in the district court. Now Mr. Cardle mentions that there are references to confusion and things in the complaint. There are. There are references to the confusion that appellants themselves instigated in their own supporters. Mr. Cardle mentions, well now my clients have to go and explain to people that the oath does not prevent you from voting in August. The complaint shows they said exactly the opposite thing. They went to their supporters and said, well if you sign this oath, you're not going to be able to vote in August, which is false and exactly the opposite of the representation. He's now on appeal complaining that his clients have to make. I get that there's different arguments being made. You know, on the merits, I got to say, so I took a quick look and I've been doing statutory interpretation for a long time. I took a quick look at this oath and I said, originally I reached the conclusion. I was like, well does this prevent you from voting? And then I had to really sit down and then I analyzed it like a judge would. You know, parsed it out, did some grammatical stuff and figured out that the district court's right. The technical reading is right. But you know, I don't expect a voter to sit down and parse it necessarily the way I did as a judge. And so I'm wondering if, and I don't know exactly what the claim is. It's not vagueness, but I wonder if there's just some vagueness to this that leaves a voter sort of wondering, what do I do? Can I vote? Can I not vote? Do I risk prosecution? What really is the right interpretation of this? Well, I think our position is that it is about as straightforward as it can be to mean something like this. Again, as Mr. Carter pointed out, there are three sections to this oath. And your honor, having gone through the process you just described, I'm sure you saw that too. The first has to do with the signer's knowledge of the third part is signing the petition of their own free will. That's not an issue. It's the second part. I do not intend to vote at the primary election for the office for which this nominating petition is made. The crucial portion of that is I do not intend to vote at the primary election. But I think the point is that that's one interpretation. Another interpretation is I have no intention of voting in the primary, which seems to me to be a much stronger statement of that than a simple present intention. But I don't have any intention of doing that. It seems to me equivalent or nearly equivalent to saying I'm not going to. And it seems to me that that's a possible interpretation of these words. All right. Well, who gets to decide definitively what these words mean? I mean, this is this is a difficulty in my mind. Well, I suppose in theory, the I mean, the court could refer this case to the Minnesota Supreme Court to put a definitive interpretation on this statute. I don't think that's necessary. The secretary's position is that I do not intend to vote at the and sufficiently a sufficiently simple explanation and I suppose reference to the petition signers present intent, because that's what it says. I do not intend. But even the slight gloss that you're going to put on it, I have I have no intention of voting in in August. That that, too, is a statement about about the signers present intent on Memorial Day or thereabouts to to vote in August. And the question of whether that that oath has been signed falsely is a question about what that what that potential voters intention was in May or June. And that is that is the relevant question. What was that? What was that person's intent at that point? Which is exactly what those words mean. What I do not intend or I have no intention, either one, either one of those. It strikes me means that. And so the idea that they can be prosecuted, it's difficult for me to understand in this hypothetical prosecution that appellants have brought up. County Attorney Cardall, what presentation is he going to make for this person who assigned to assign this oath and then voted in August? What presentation is he going to make that? Wait a minute. You signed that oath and then you voted in August. If I'm the defendant, I'd like to know from County Attorney Cardall, which part of that of that statutory text have I violated? Which part of that is not true? I represent and you have no contrary evidence that my intention as of Memorial Day when I signed this was I wasn't going to vote in August at all. That was my intention. Then and then in July, I changed my mind. Which which part of this oath statute does Mr. Cardall think there could be even a coherent interpretation that that that that violates? And I just wonder if I just wonder if there's and I'm borrowing. And no, it doesn't apply. I just wonder whether there's a chilling effect here, which is the language is it's such a way that leaves the voter without maybe, you know, maybe I just shouldn't vote. Maybe I just shouldn't do it because I'm risking prosecution potentially. And I remember vaguely signing this oath a few months ago. And maybe I just shouldn't vote. I think that's I can understand that concern to that. I just have to I would have two responses. Number one is that's diametrically opposed from the claim that was actually made in the complaint, which is that this thing bans people from voting in August. We tell people it bans you from voting in August, and that's constitutionally impermissible. Only on appeal have they raised anything approaching what your honor has just raised. The other thing I would point out is that as the record below reflects, a very large number of candidates have used this process, have used petitions with exactly that oath on them to get onto the ballot. In substantive empirical fact, this is not chilling people from getting on the ballot. Again, the numbers that we have, and I have them very specifically here, between 2000 and 2018, as docket number 24-1 explains, there have been 148 successful nominating petitions. 27 of them were submitted by the Libertarian Party, and three of those 27 came from individual appellants in this case themselves. And facts like that in prior cases, including the American Party of Texas case, have been grounds for courts to treat very scornfully the kinds of claims that appellants are. But your point is, this is important to me, your point is even if it might kill the vote later, it doesn't really matter for purposes of this particular complaint, because the fact of the matter is it doesn't chill people from signing the nominating petition, which is central in this case. Right. The claims in this case are all about signing nominating petitions and the burden on the appellants as they're trying to get through nominating petitions. As a minor party, they don't participate in the primary election. So any deleterious effect this could have on the primary election itself is not presented. There's no standing here. There's no injury in fact for a claim like that. All right. I think we've sufficiently addressed the oath issues. There are two other arguments that the appellants are making, and I just want to brush past them quickly with the amount of time I have left. Their second argument is that a Minnesota law doesn't allow what you could call absentee petition signing. It doesn't allow people to sign and in both primary and general elections, absentee voting is permitted. You got two problems with that. Number one, they just haven't provided any precedential basis to conclude that states are required to permit people to sign petitions at a distance. But really, more importantly, Minnesota law indisputably does permit people to sign petitions at a distance and return them to the petitioning candidates by mail or email or whatever. So just as a matter of fact, what they're claiming is a violation of the constitutional rights is not actually a violation because it doesn't exist. That area of Minnesota law does not burden their rights for the same reason Santa Claus doesn't burden their rights because it isn't real. The final argument they're making comes from that Socialist Workers Party case, and it's their contention that the signatories on their petitions ought to be protected from public access as if their signatures were secret ballots. They're trying to pitch that tent with one poll, the Socialist Workers Party case out of West Virginia Fourth Circuit. The major problem is that case doesn't support that outcome. That case just strikes down a desire to vote clause that was on the West Virginia certificates. We don't have any language like that. So that's just, it's inapposite for that reason. And the other thing is that neither that case nor any other required secret ballot treatment. So that's all I have to present, Your Honor. If you have questions, I'm happy to answer them. Otherwise, the Secretary of State respectfully requests that the court affirm the district court's decision below. Thank you. Judge Carter, could I ask one additional question? Certainly. So on that last point you make, I struggled with the point about public disclosure. And, you know, I think what you say factually about the case and the differences with the case they rely on is right. What is the state's view about how we should approach that issue? If you were to write the opinion, in other words, why does that claim have no merit in your view? What boxes it go in? Similarly situated, differential treatment. That's really what I'm asking. I'm not quite sure. Similarly situated. I suppose we certainly do to people who submit, who vote at elections, because the purpose of a nominating petition is fundamentally different than the purpose of a vote at either a primary or a general election. And I'm not aware that any court has ever held that those things are similarly situated. And then, I mean, I mentioned differentiating the cases for the desire to vote language. I think you wanted to exclude that. Does that sufficiently answer your question? Well, I'm just trying to a little unsatisfying to say this claim is not like that case and therefore you lose. That doesn't necessarily get you to the end because you don't lose just because your case is not like another case. So I'm just trying to figure out doctrinally where this fits in and what the best way to respond to that claim is in the state's view. Well, I guess I would say that the appellants have not provided a sound legal foundation for the notion that they are entitled to have their signatures protected in the first place. I mean, because of the desire to vote angle that makes the one precedent, the sole precedent they have cited on this issue irrelevant. I haven't chased it down entirely, but it does strike me that the U.S. Supreme Court's decision in Doe versus Reed, which we cited below, I don't think either party has cited at this court, that has to do with protecting petition signatures on referendum petitions. Referendum petitions are not exactly the same thing as nominating petitions, but I'm not sure why the distinctions between them would matter for this purpose. And the U.S. Supreme Court in Doe versus Reed held that it is entirely constitutional for a state to publicize the names that are on referendum petitions. And I mean, to the extent that we're doctrinally looking at that issue, I think Doe versus Reed is where I would look because insofar as the Fourth Circuit case, and I think Mr. Cardall mentioned the Kentucky Sixth Circuit case, insofar as those would have some analogous application here, they both predate Doe versus Reed. And I would suggest that it's at least questionable whether that kind of idea can be applied in this case in light of Doe. Okay, thank you. I appreciate it. Thank you very much. Thank you, Mr. Hartshorn. Mr. Cardall, your rebuttal, please. Thank you, Your Honor. I just returned to the beginning when the state statute was drafted and enacted, the legislators would have known that they could have wrote that the signer forfeits the right to vote. Counsel, I'm sorry. I'm sorry. I need to ask a question, if I may, about the basis for your disclosure claim. Are you claiming that this is a violation of associational rights? Are you making the claim that it's an equal protection violation, that it's privacy? What exactly is the valid secrecy? It's under association and equal protection because the major parties are treated differently. With respect to that moment then, with respect to the legislative enactment, the legislature could have said the signer forfeits the right to vote. Maybe they didn't want to use the phrase forfeit the right to vote. And then they chose this other language. I appreciate Judge Strauss mentioning that a judge would read this by inserting the word, like the lower court did, I do not presently intend to vote, but a simple hypothetical. I signed an oath a month ago saying I do not intend to vote at the primary election for the office. I'm not going to do it. It basically shows that the public can have two reasonable interpretations. Both the lower court, now the government, has said my interpretation, which is not insert the word presently in there, is false. But yet it's an interpretation my clients have made. My clients have listened to potential signers make that argument. So why would this hinge on a single judge's or three judges' interpretations of this statute when the public would obviously interpret it in different ways? And according to Anderson v. Calabrese, the court is supposed to consider the extent which those interests make it necessary to burden the plaintiff's rights. And so is it necessary for the state to have this oath, which can be interpreted differently by the public, making the nomination petitioning process difficult, when there are simple alternatives like forfeiting the right to vote, as in West Virginia, or maintaining the right to vote in Kentucky? In fairness, under this Rule 12 dismissal appeal, plaintiffs assert lots of things about the text that they say violates the source of the rights. When there's a surprising interpretation by the lower court, then the appellant is permitted to make those arguments in response to the surprising interpretation by the lower court to the Court of Appeals. It's in the natural course of statutory interpretation, this back and forth, gladiators in the arena. And this case has been, I think, presented so the court can make a decision. Thank you. Thank you both, counsel. We appreciate your appearance and argument today. Case is submitted and we will decide it in due course.